PEOPLE OF PORTO RICO, Plaintiff and Appellee, *v.* EMILIO NIEVES, Defendant and Appellant.

No. 3784. Argued June 6, 1929.—Decided December 24, 1929.

368

*E. Martínez Avilés,* for appellant.   *R. A. Gómez,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

The information in this case, in its pertinent part, reads as follows: "Said defendant Emilio Nieves, on October 5, 1928, and in the ward of Arrozal of Arecibo, . . . unlawfully, wilfully, maliciously and feloniously, upon a sudden quarrel or heat of passion assaulted with a machete, which is a deadly weapon, and with intent to kill, Otilio Roig (a human being), inflicting on him serious wounds which caused his death on the following day."

The accused pleaded not guilty, the case went to trial and the jury brought in a verdict of guilty. On December 21, 1928, the court sentenced Nieves to four years in the penitentiary at hard labor.

The present appeal has been taken from that judgment, and it is urged that the trial court erred: (1) in refusing to allow the medical expert introduced by the defense to testify regarding the inadequate medical treatment received by Otilio Roig after he was wounded; (2) in not permitting the defendant to introduce further evidence after having allowed two of the jurors, at the close of the evidence for prosecu-

tion and the defense, to put questions to the only witness introduced by the government; (3) in rendering judgment against the accused, notwithstanding the verdict is contrary to the law and the evidence; (4) in failing to sum up the evidence in its instructions to the jury; and (5) in imposing on the accused an excessive penalty, considering the circumstances under which the offense was committed.

As the fifth error is not discussed in the brief, we will not consider it. Besides, if the conclusion is reached that the verdict of the jury in the present case was proper, it is so manifest that there would not be the slightest basis for considering excessive the penalty imposed by the court on the appellant, that this omission of his counsel is perfectly explainable.

Changing the order of the assignments, we will take up the third, wherein it is contended that the verdict is contrary to the evidence. We might confine ourselves to saying that, since the evidence is conflicting and the conflict has been resolved by the jury, its verdict should stand; but in view of the circumstances of the case, and of the stress laid upon the contention that the evidence is not sufficient, we will proceed to analyze it.

The evidence introduced by the prosecution included a certificate from the civil registry showing that Otilio Roig Quiñones, thirty-eight years old, married, a resident of Arecibo, white, and a laborer, died at 10:30 o'clock in the evening of October 6, 1928, "from secondary hemorrhagic shock or dagger wounds," in the municipal hospital of Arecibo.

The wounds, according to the medical expert who testified at the trial, were: a slight wound on the left ear; another wound on the left side of the face, rather deep; another on the left hand, dorsal region, which severed the tendons of the middle and index fingers and reached the bones; and another large wound on the right arm, so deep that it severed the biceps and the brachial muscles. He had other injuries

(contusions) on his back. It was the wound on the arm which produced the hemorrhage resulting in death.

Besides the physician, only another witness· was introduced by the prosecution. It was Rafael Roig, a twelve-year old son of the victim, who testified as follows:

"Father went out to the farm and found Emilio cutting wood in father's property, and told him not to destroy that wood and leave it there; he (Emilio) used bad language and then struck father with the dagger. Father had a broken machete and could not defend himself with it. It fell from his hands and I picked it up and ran, because he (Emilio) was going to strike me."

Although insistently examined and cross-examined, he maintained his statements.

The defendant, in order—as his counsel said—"to show that this accused did not mean to kill Roig and that what he did was to defend himself and to avoid being killed and that, if he had not done as he did, he would now be dead," introduced Alejo Nieves, a brother of the accused as a witness. Alejo testified as follows: ·

"Emilio and I were making a fire . . . We were making the fire and Otilio Roig came up and said: son of a bitch, this wood is mine; and Emilio said, if it is yours take it because I am going home; and Otilio Roig said: no, I have come to kill you or to be killed by you . . . He immediately grabbed the machete and attacked him . . . Yes, Sir: Roig wounded Emilio on the arm . . . before Emilio wounded him . . . Roig, after being wounded, walked away to where Juan Centèno was and Emilio towards home . . . I came away with Emilio."

The cross-examination was partly as follows:

"Q.—Tell me, how did he defend himself? Parring with the the dagger. Q.—He did nothing but parring with the dagger? Stepping back. Q.—Is that all he did? Yes. Q.—Nothing else? Nothing else. Q.—Did he always do that and nothing else? No. Q. —Nor did he wound him either? Yes, he wounded him on the wrist; Otilio Roig wounded the other. Q.—But did Emilio Nieves wound the other? No. Q.—Are you sure? At the beginning of the attack he did not do him anything.. Q.—And when did he do him anything?

When he saw that Otilio was going to kill him, he defended himself as best he could. Q.—How did he defend himself, that is what we want to know? What did he do to him in order to defend himself? Stepping back and parring with the dagger every thrust made at him. Q.—Is that all he did? Yes.''

Testifying in his own behalf, Emilio Nieves partly stated:

''While I was making that fire in father's property ·Otilio Roig arrived and said: you, scoundrel, son of a bitch, who has given you that land?, to which I answered: if that land is yours you can take it and the pyre, as I am going home; whereupon he jumped on me and I defended myself and said to him: Otilio, let us not fight because that is not worth it, and he said: it is either of the two; and again I said: let us not fight because that is not worth it . . . Q.— Did he wound you first? He did. Q.—Was he the first to attack you with the machete? Yes. Q.—Did he wound you? Yes. Q.— Where? On this wrist. Q.—Before you defended yourself. Yes. Q.—Have you any scar on that hand? Yes. Q.—Show it to the jury. (He shows it).''

Then, on cross-examination, he stated:

''Q.—Did he attack you with the machete? Yes. Q.—How? In this way. Q.—And did he wound you on the hand? Yes. Q.— And is that the only scar? Yes. Q.—Did he not sever your arm? No; he did not sever my arm because I had my coat and my shirt on, which were cut. Q.—Is that all he did to you? That is all. Q.—Did he not·inflict on you another wound? No, I defended myself as best I could.''

Such was the evidence. It is true that the only eyewitness offered by the prosecution was a biased witness. But so also was the one introduced by the accused. The former was a son of the victim; and the latter a brother of the defendant.

The result of the struggle corroborates the testimony of the government witness. The number, location and seriousness of the wounds inflicted by Nieves upon Roig as compared with the only wound which, according to Nieves, Roig inflicted on him, and the scar of which he showed to the jury only two months and twelve days after the injury had

been caused, inclines us to favor the theory of the prosecution.

The evidence is sufficient to prove the commission of the crime and the guilt of the accused. The third assignment of error, therefore, is without merit.

The first assignment raises a question, which has already been considered and decided by this court in another voluntary manslaughter case, brought up from the District Court of Arecibo—the case of *People* v. *Juan Rodríguez*, 39 P.R.R. 840, where we said:

"On appeal our attention is drawn to the fact that the deceased might not have died if he had obtained due medical attention. In other words it is insisted that Albarrán would not have died if he had received due medical treatment. A doubt might arise if a blow like the one in this case would ordinarily have caused death. However, death was the natural consequence of the blow in this case. There was no intervening other cause. The failure to obtain adequate medical treatment is not such an intervening cause.

"The jurisprudence is clear and has been for centuries that if a blow is given not necessarily fatal, yet the victim dies, the aggressor, the other necessary elements of crime concurring, may be held for homicide. Rew's case, J. Kelyng 26, English Reprint vol. 84, p. 1066, People v. Lewis, 124 Cal. 551, 13 R.C.L. 751, paragraph 57, and cases cited; note 22 L.R.A. (N.S.) 841 and other citations contained in the brief of the government."

That being so, it is evident that the trial court did not err "in refusing to allow the medical expert introduced by the defense to testify in regard to the inadequate treatment received by Otilio Roig."

In this connection it would seem advisable to quote the following summary of three applicable decisions rendered by the Supreme Courts of Iowa and Montana:

"On a prosecution for murder, there was no error in refusing to allow counsel for the defendant to go into the question whether some particular form of surgical operation might have saved deceased's life; there being no evidence indicating any other cause of death than the act of defendant." *State* v. *Seery*, 105 N.W. 511.

"Where in a prosecution for homicide,, it was shown that death

followed the injury, without other independent intervening cause calculated to produce death, had decedent not been injured by defendant's wrongful act, evidence of lack of proper attention to deceased after the injury, and before death, was properly excluded.'' *State* v. *Pell* 119 N.W. 154.

''In a prosecution for homicide, where the defendant contended that the death resulted from maltreatment, and not from the wound, a question asked the physician who treated the deceased whether, if the deceased had received prompt and proper surgical treatment, he would have died in so few hours did not tend to show that the wound was not mortal, and was properly excluded.'' *State* v. *Halk*, 141 Pac. 149.

It is only logical that such should be the rule, since everyone is responsible for the natural consequences of his acts.

That, however, does not mean that where a person, who has been wounded, dies within one year and a day after the stroke received (section 205 of the Penal Code), the defendant would be precluded from showing that the death was actually due to an independent cause other than the wound. In such a case, death would not be the natural consequence of the wound but of the other independent cause, and hence no crime would result. That the death in the case herein was the natural result of the wound is shown by the very testimony of the medical expert, who, in spite of all and after a long argument of counsel at the trial, was permitted to testify as follows:

''Examined by attorney Martínez Avilés he testified: Q.—Could you state the cause of the death of Otilio Roig? The man, when brought to the hospital, as previously stated by me, had lost a great amount of blood, due to the fact that the ligatures which had been applied were not sufficiently tight, and the hemorrhage, continued until he reached the hospital and received the necessary attention. He was under a deep shock owing to the hemorrhage, which shock was the direct cause of his death. Q.—Was it the shock? Yes; the shock produced by the hemorrhage. Q.—Did you state before that none of these wounds was necessarily mortal? None of them.''

The second and fourth assignments of error—predicated,

respectively, upon the trial court's refusal to allow the accused to introduce some evidence after two jurors had been permitted to examine the government witness at the close of the evidence and when both sides had rested, and upon the court's failure to sum up the evidence in its instructions to the jury—are without merit.

It happened that at the close of the evidence for the accused one of the jurors requested the court whether he could put some questions to witness Rafael Roig. The court granted the request, and the witness was called to the stand and examined in regard to the same particulars of his previous testimony. Then the following incident took place:

"Attorney Martínez Avilés.—Now that the case has been reopened I ask leave of the court to be permitted to examine another witness for the accused. District Attorney.—I object to the case being reopened. Attorney Martínez Avilés.—It is within the discretion of the court.—It could have refused the request of the juror, and it is also within its discretion to allow counsel for the accused to put questions to a witness. (Counsel on both sides argued the point). Judge. —The objection of the district attorney is sustained. Attorney Martínez Avilés.—I take exception."

Counsel for the accused himself maintained at the trial that the matter was within the discretion of the court, and we do not find that such discretion was abused.

We have read the instructions and, although the trial judge does not go into the details of the evidence introduced, he refers to it clearly and distinctly. It was a case with very few witnesses and their testimony was fresh in the minds of the jury, since the evidence was heard and the verdict was rendered on the same day.

The instructions are clear and precise and counsel for the accused, at the conclusion of the instructions, merely stated: "We take exception to the instructions given." Counsel did not state in what particulars, in his judgment, such instructions were erroneous or insufficient.

The judgment appealed from must be affirmed.